## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

_____
                                        )
**Larry Burnett, _et al_.,**            )
                                        )
  **Plaintiffs,**                       )
                                        )
       **v.**                           )        **Civil No. 13-02047 (APM)**
                                        )
**American Federation of Government**   )
**Employees,**                          )
                                        )
       **Defendant.**                   )
_____ )

## MEMORANDUM OPINION AND ORDER

### I.  INTRODUCTION

Plaintiff Larry Burnett is an African American man and owner of Plaintiff Status Controls, Inc., a corporation that provided electrician services to Defendant American Federation of Government Employees ("AFGE").  Burnett and Status Controls filed suit against AFGE, alleging that AFGE subjected them to racial discrimination and a hostile work environment in violation of the Civil Rights Act of 1866, 42 U.S.C. § 1981.  Status Controls also asserted claims of breach of contract, conversion, and tortious interference with contract and business relations.  Burnett asserted an additional claim of intentional infliction of emotional distress.  Before the court is Defendant's Second Motion to Dismiss all six counts in Plaintiffs' First Amended Complaint pursuant to Federal Rule of Civil Procedure 12(b)(6).

For the reasons stated below, the court denies Defendant's motion as to all counts, except the two Section 1981 claims against Burnett.

## II.    BACKGROUND

Plaintiffs' First Amended Complaint alleges the following.  Burnett, an African American man and resident of Maryland, is the owner and chief operating officer of Status Controls, Inc. ("Status"), a Maryland corporation.  Am. Compl., ECF No. 8 ¶¶ 1-2, 5-6.  On November 3, 2011, AFGE retained Status to repair and test the elevators at its principal office in Washington, D.C., on "a time and materials basis." *Id.* ¶¶ 3, 9, 13-14.  "Upon completion of the work to the elevators," AFGE retained Status "to perform various other tasks on a time and materials basis," including running cables, repairing back-up generators, removing chiller units, and renovating utility rooms. *Id.* ¶ 15.

### A.    Alleged Workplace Hostility Because of Race

In late August 2012, AFGE employees began discriminating against Burnett and other Status employees because they were African American.  *Id.* ¶ 16.  AFGE had retained Status to run feeder cables—a type of electrical wiring—to "chiller," or cooling, units that were to be installed on the premises.  *Id.* ¶ 17.  Because Status was completing the work, "[t]he building's chief engineer, a white man, explained to the project manager, another white man, that the feeder cables should not be added to the renovation[.]" *Id.* ¶ 18.  The project manager replied to the chief engineer "you don't wants [sic] those black people doing that work for you."  *Id.* ¶ 19 (internal quotation marks omitted).

In September 2012, a white woman employed by AFGE confronted Burnett and another African American Status employee and asked "you people are still here?"  *Id.* ¶ 21 (internal quotation marks omitted).  Later that month, the same AFGE employee again approached Burnett and asked "you black people are still here?"  *Id.* ¶ 22 (internal quotation marks omitted).

In late September or early October 2012, AFGE employees discussed how management did not like having Status or Burnett on site "due to Burnett's race." *Id.* ¶ 23. Around the same time, AFGE's project manager told another AFGE employee "[t]hats [sic] what you get with them black people working here," referring to Status' workers. *Id.* ¶ 24 (internal quotation marks omitted).

Also, in September 2012, the National Secretary/Treasurer of AFGE, an African American man, was assigned to oversee the AFGE offices in Washington, D.C. *Id.* ¶ 28. The National Secretary/Treasurer called a meeting with the project manager, the chief engineer, and Burnett, where he explained that he was "the project manager's new boss and he did not want to see him going to the National President to complain about his new supervisor." *Id.* ¶ 29. After the National Secretary/Treasurer left the meeting, the project manager referred to the National Secretary/Treasurer as "one stupid n*****." *Id.* ¶ 30 (internal quotation marks omitted). Approximately two months later, the National Secretary/Treasurer told Burnett and another African American Status employee that Burnett and Status should be "alert" as "[t]hese white people don't like you and are out to get you because you're black. Watch yourself." *Id.* ¶ 27 (internal quotation marks omitted). He further told Burnett that Burnett "was the only minority contractor [who was permitted] to work at the subject building." *Id.*

In December 2012, AFGE asked Status to provide an estimate for a project to upgrade AFGE's security system. *Id.* ¶ 34. Sometime later in December 2012, AFGE representatives notified Burnett that Status had not delivered the upgrade in a timely manner. *Id.* ¶ 35. According to Plaintiffs, this was "incorrect as the upgrade had not been ordered." *Id.* During the same meeting, AFGE representatives told Burnett to conduct his operations at night so that he and his "contract employees [would] be kept out of sight" because "all of Status' contract employees were

black" and "their status as such scared people."  *Id.* ¶ 36.  Other employees of contractors and subcontractors working on the renovation, however, all of whom were white, were visible to the public and to AFGE management.  *Id.* ¶ 37.

  **B.**  **Contract Interference and Termination**

  On January 1, 2013, AFGE and Status entered into a commercial agreement for independent contractor services.  *Id.* ¶ 40.  Shortly thereafter, AFGE employees "conspired to terminate Status from its work, claiming that Burnett and the chief engineer conspired to steal copper in the disposal of the chiller units," even though industry standards required removal and disposal of the units.  *Id.* ¶ 41.  AFGE "without cause" terminated its contract with Status and refused to pay Status for work performed or for materials purchased on behalf of AFGE.  *Id.* ¶¶ 42- 44.  In addition, AFGE refused to return Status' tools and equipment.  *Id.* ¶ 44.

  Moreover, after terminating the contract, AFGE initiated a campaign to blame Status for the negligence of others.  *Id.* ¶ 45.  In October 2012, Status began installing piping in the building's elevator shafts.  *Id.* ¶ 25.  As part of this project, Status arranged for a pringle switch[1] expert to perform certain maintenance tasks that Status was not qualified to perform.  *Id.* ¶¶ 25-26.  Apparently, the pringle switch failed or malfunctioned, causing an explosion in the elevator shaft.  *Id.* ¶ 45.  Because of "Burnett's race and AFGE's status as a minority-owned business," AFGE blamed Status for the explosion, even though it knew that "this explosion was caused by another contractor."  *Id.* ¶ 45.  AFGE further expressed its racial animus by filing a claim with its insurance company that wrongly attributed fault to Status for the pringle switch explosion.  *Id.* ¶ 45.  As a result of the false claim, Status had to respond to a subrogation claim and "its relations with its

---

[1] The Pringle Switch, first manufactured by Eaton Corporation, is a bolted-pressure contact switch used on switchboards.  Eaton Corporation, *Pringle Bolted-Pressure Contact Switches*, (Nov. 2009), http://www.tristateelectricmc.com/pdf/Eaton%20Cutler-Hammer%20Pringle%20Bolted%20Contact%20Pressure%20Switches%20brochure%20DM00808002E.PDF

own insurance carrier have been interfered with and will potentially result in [an] increased premium and a different insurance rating[.]" *Id.* ¶ 83.

## III.   LEGAL STANDARD

Pursuant to the Supreme Court's decisions in *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544 (2007), and *Ashcroft v. Iqbal*, 556 U.S. 662 (2009), a complaint must contain "sufficient *factual matter*, accepted as true, to state a claim to relief that is plausible on its face." *Iqbal*, 556 U.S. at 678 (emphasis added) (quoting *Twombly*, 550 U.S. at 570) (internal quotation marks omitted). A claim is facially plausible when "the plaintiff pleads *factual content* that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* (emphasis added) (citing *Twombly*, 550 U.S. at 556).  Factual allegations that are "merely consistent with a defendant's liability . . . stops short of the line between possibility and plausibility of entitlement to relief." *Id.*  (quoting *Twombly*, 550 U.S. at 557) (internal quotation marks omitted).  While the factual allegations need not be "detailed," the Federal Rules demand more than "an unadorned, the-defendant-unlawfully-harmed-me accusation."   *Id.*  (citing *Twombly*, 550 U.S. at 555). "Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Id.* (citing *Twombly*, 550 U.S. at 555).

When assessing a motion to dismiss based on Federal Rule of Civil Procedure 12(b)(6), the court must accept Plaintiff's factual allegations as true and "construe the complaint in favor of the plaintiff, who must be granted the benefit of all inferences that can be derived from the facts alleged." *Hettinga v. United States*, 677 F.3d 471, 476 (D.C. Cir. 2012) (citations omitted) (internal quotation marks omitted); *accord Singh v. District of Columbia*, 881 F. Supp. 2d 76, 81 (D.D.C. 2012).  The court shall not "accept inferences drawn by [the] plaintiff if those inferences

are not supported by the facts set out in the complaint, nor must the court accept legal conclusions cast as factual allegations." *Hettinga*, 677 F.3d at 476 (citations omitted).

## IV.    ANALYSIS

### A.  Violations of 42 U.S.C. § 1981 (Counts III and IV)

Title 42 U.S.C. § 1981 protects the right of "[a]ll persons within the jurisdiction of the United States" to "make and enforce contracts . . ." without respect to race.  42 U.S.C.A §1981(a) (2014).  The current version of the statute defines "make and enforce contracts" to "include[] the making, performance, modification, and termination of contracts, and the enjoyment of all benefits, privileges, terms, and conditions of the contractual relationship."  42 U.S.C.A §1981(b) (2014).  Any claim brought under section 1981 "must initially identify an impaired 'contractual relationship' . . . under which the plaintiff has rights."  *Domino's Pizza v. McDonald*, 546 U.S. 470, 476 (2006) (footnote omitted).  Both Burnett and Status allege that AFGE subjected them to disparate treatment discrimination and a hostile work environment in violation of Section 1981. *See* Am. Compl., Counts III and IV at 8-9.

The parties' briefing has narrowed the issues the court must address concerning the Section 1981 claims.  Burnett concedes that because AFGE's contract was with Status—not with him personally—he does not have cognizable Section 1981 claims.  Pl.s' Opp., ECF No. 10 at 3. Burnett's Section 1981 claims, therefore, are dismissed with prejudice.  In addition, although AFGE's motion seeks dismissal of "all of the causes of action in the complaint," Mot. to Dismiss, ECF No. 9, AFGE has not specifically articulated why Status' disparate treatment count fails to state a claim.  *See* Def.'s Mem. in Supp. of Second Mot. to Dismiss, ECF No. 9-1 (hereinafter Def.'s Mem.).  Because "[it] is not the court's role to fill in the blanks in counsel's argument," *The Power Co. of America v. FERC*, 245 F.3d 839, 845 (D.C. Cir. 2001), and because Defendant has

not specified an argument to support dismissal, the court does not consider Defendant to have moved to dismiss Status' disparate treatment claim, *see Cement Kiln Recycling Coal. v. EPA*, 255 F.3d 855, 869 (D.C. Cir. 2001) (per curiam) ("A litigant does not properly raise an issue by addressing it in a 'cursory fashion' with only 'bare-bones arguments.'") (quoting *Wash. Legal Clinic for the Homeless v. Barry*, 107 F.3d 32, 39 (D.C. Cir. 1997)) (other citations omitted).  Thus, the only Section 1981 claim that remains for the court's consideration is Status' hostile work environment claim.

As to that claim, AFGE advances only a narrow argument.  It contends that Status has failed to state a claim because it has not alleged any harm to itself that is separate and distinct from the "emotional harm and suffering of Mr. Burnett."  Def.'s Mem. at 7.  The court disagrees.  In *Gersman v. Group Health Association*, the Court of Appeals held that a corporation whose contract was severed "solely because an individual associated with [the corporation] was Jewish" could bring a Section 1981 claim because "the injury suffered by the plaintiff [corporation] falls within the zone of interests protected by the statute[.]"  931 F.2d 1565, 1569 (D.C. Cir. 1991), *vacated on other grounds*, 502 U.S. 1068 (1992), *reinstated* 975 F.2d 886 (D.C. Cir. 1992).  Similarly here, Status has alleged harm separate and apart from its owner, Burnett.  Status claims that the hostile work environment its employees experienced caused it to "[lose] and . . . continue to lose business" and that it has "lost and will continue to lose the benefit of [its] bargain with AFGE[.]"  Am. Compl. ¶ 68.  It remains to be seen whether Status can assemble proof of separate injury to prevail at trial or at summary judgment.  At this stage, however, when the court must treat as true the allegations in the complaint and draw all reasonable inferences in a plaintiff's favor, Status' allegation of separate harm is sufficient to overcome AFGE's motion.  *Cf. Lujan v. Defenders of Wildlife*, 504 U.S. 555, 561 (1992) (stating with respect to establishing standing that, "[a]t the

7

pleading stage, general factual allegations of injury resulting from the defendant's conduct may suffice"). Defendant's motion to dismiss with respect to Count IV is therefore denied.

### B.      State Law Claims

Next, Defendant contends that Plaintiffs have failed to adequately plead their state law claims. The court turns first to Burnett's claim for intentional infliction for emotional distress (Count V), and then considers Status' claims for breach of contract (Count I), conversion (Count II), and tortious interference with contracts and business relations (Count VI).

### 1.      Intentional Infliction of Emotional Distress (Count V)

To establish a claim of intentional infliction of emotional distress, a plaintiff must show "(1) extreme and outrageous conduct on the part of the defendant which (2) intentionally or recklessly (3) causes the plaintiff severe emotional distress." *D.C. v. Tulin*, 994 A.2d 788, 800 (D.C. 2010) (citations omitted) (internal quotation marks omitted).[2] "Intent or recklessness can be inferred from the outrageousness of the acts." *Howard Univ. v. Best*, 484 A.2d 958, 985 (D.C. 1984) (citations omitted). Defendant argues that Burnett's allegations of racial bias and hostility do not rise to the level of "extreme and outrageous" conduct. Def.'s Mem. at 7-9.[3]

In deciding whether alleged conduct is "extreme and outrageous," the court must consider: "(1) applicable contemporary community standards of offensiveness and decency, and (2) the specific context in which the conduct took place[.]" *King v. Kidd*, 640 A.2d 656, 668 (D.C. 1993) (citation omitted). The "liability clearly does not extend to mere insults, indignities, threats, annoyances, petty oppressions, or other trivialities," although statements that were considered a

---

[2] District of Columbia substantive law applies to the four state law claims because the conduct that forms the basis for the alleged claims occurred in the District of Columbia. *See Olaniyi v. District of Columbia*, 763 F. Supp. 2d 70, 93 n. 19 (D.D.C. 2011) (citations omitted).

[3] Defendant also argues that Burnett's claim of intentional infliction of emotional distress should fail because that claim is encompassed by his Section 1981 claims. *See* Def.'s Mem. at 8-9. However, because Burnett does not have a cognizable Section 1981 claim, there is no legal obstacle to his proceeding on a personal tort claim.

"petty oppression," "trivial" or merely "inconsiderate and unkind" fifty years ago may be "extreme and outrageous" conduct under "today's social standards and principles (or vice-versa)." *Id.* (citations omitted) (internal quotation marks omitted). Courts have applied a balancing test to determine whether the alleged conduct "violates prevailing social norms and is sufficiently outrageous to ensure that the advantage to society of preventing such harm seems greater than the advantage of leaving ill-disposed persons free to seek their happiness in inflicting it." *Id.* at 668-69 (citations omitted) (internal quotation marks omitted).

In the work place, isolated incidents of race discrimination generally will not qualify as "extreme and outrageous" conduct. *See, e.g.*, *Paul v. Howard Univ.*, 754 A.2d 297, 308 (D.C. 2000) (holding that a "few isolated incidents" do not suffice to establish a *prima facie* case of intentional infliction of emotional distress).[4] But a pervasive discriminatory environment does. The "[c]reation of a hostile work environment by racial or sexual harassment may, upon sufficient evidence, constitute a prima facie case of intentional infliction of emotional distress." *Best*, 484 A.2d at 986 (citing *Contreras v. Crown Zellerbach Corp.*, 565 P.2d 1173, 1777 (Wash. 1977) (en banc), which held that a Mexican American plaintiff had stated a cause of action for intentional infliction of emotional distress where he alleged that he was repeatedly subject to racial slurs). And "[r]epeated harassment . . . may compound the outrageousness of incidents which, taken individually, might not be sufficiently extreme to warrant liability." *Best*, 484 A.2d at 985 (citations omitted) (internal quotation marks omitted).

---

[4] This is not to say that an isolated incident of racial discrimination might not give rise to hostile work environment claim under Section 1981. In *Ayissi-Etoh v. Fannie Mae*, the Court of Appeals held that the trial court erred by granting summary judgment to an employer on an employee's Section 1981 hostile work environment claim when the evidence showed, *inter alia*, that his supervisor on one occasion had used the n-word when expelling the employee from his office. The court explained that, "[a]s other courts have observed, perhaps no single act can more quickly alter the conditions of employment than the use of an unambiguously racial epithet such as [n-word] by a supervisor. This single incident might well have been sufficient to establish a hostile work environment." 712 F.3d 572, 577 (D.C. Cir. 2013) (citation omitted) (internal quotation marks omitted).

AFGE construes Burnett's tort claim as resting on two utterances of the n-word that were not directed at Burnett but at AFGE's National Secretary/Treasurer. Def.'s Mem. at 8 (citing Am. Compl. ¶¶ 30-31). Defendant argues that, although those statements are "highly offensive," they do not constitute "extreme and outrageous" conduct. *Id.* Defendant's reading of the complaint is far too restricted. The complaint recounts a pattern of racist and discriminatory comments and conduct far beyond two mere utterances of the n-word. AFGE's project manager said to its chief engineer "you don't wants those black people doing that work for you," Am. Compl. ¶ 19; an AFGE employee directly asked Burnett are "you black people are still here?" *id.* ¶ 22; the project manager told an AFGE employee "[t]hat's what you get with them black people working here," *id.* ¶ 24; AFGE's National Secretary/Treasurer told Burnett that "[t]hese white people don't like you and are out to get you because you're black," *id.* ¶ 27; and the project manager twice uttered the n-word, *id.* ¶¶ 30-31. In addition to these discriminatory comments, Burnett alleges a number of racially-motivated demeaning or punitive acts by AFGE. AFGE required Status to conduct its operations at night because Burnett and his employees were African American. *Id.* at ¶ 36. AFGE falsely accused Burnett of trying to steal copper as a pretext to terminating Status' contract. *Id.* ¶ 41. And AFGE unjustly blamed Burnett for the pringle switch explosion, knowing that another contractor was responsible for the damage. *Id.* ¶ 45. As a result of these discriminatory acts, Burnett asserts that he suffered "severe mental anguish" and "substantial weight loss." Am. Compl. ¶ 76.

Taking these alleged facts as true and drawing all reasonable inferences in Plaintiff's favor, the court concludes that Burnett has stated a claim for intentional infliction of emotional distress. Although each statement or action standing alone may not be "sufficiently extreme to warrant liability," *see Best*, 484 A.2d at 985 (citations omitted) (internal quotation marks omitted), the

alleged pattern of harassing conduct was sufficiently "degrading and humiliating" to give rise to a claim of intentional infliction of emotional distress, *id.* at 986.  AFGE's motion to dismiss Count V is denied.

### 2.   Conversion (Count II)

The tort of conversion consists of "unlawful exercise of ownership, dominion or control over the personal property of another in denial or repudiation of his rights thereto."  *Shea v. Frindley*, 123 A.2d 358, 361 (D.C. 1956) (footnote omitted).  "[W]here the defendant's initial possession is lawful, the settled rule is that it [sic] the absence of other facts and circumstances independently establishing conversion, a demand for its return is necessary to render his possession unlawful and to show its adverse nature."  *Id.* (footnote omitted); *see also Savoy Const. Co. v. Atchison & Keller, Inc.*, 388 A.2d 1221, 1223 (D.C. 1988) (stating that plaintiff's version of facts justified a suit for conversion, because the evidence can support a finding that defendant unlawfully possessed plaintiff's property, and plaintiff's employee testified that he requested and was refused return of the property).

The court disagrees with Defendant's contention that Status has done nothing more than recite the elements of a conversion claim.  *See* Def.'s Mem. at 4-5.  Status alleges that it was hired by AFGE to conduct repairs and other maintenance tasks that required the use of tools on AFGE's property.  Am. Compl. ¶¶ 13-14.  Status further alleges that, after improperly terminating Status' contract, AFGE "refused to return tools and equipment owned by Status."  *Id.* ¶ 44.  Status concludes:  "AFGE without rights to same has retained tools and equipment owned by Status and further has refused to return and/or pay for materials purchased by Status with the intention of depriving Status of same and/or for AFGE's use."  *Id.* ¶ 54.  These allegations are sufficient to establish that AFGE wrongfully exercised "ownership, dominion or control" over the tools and

11

equipment owned by Status "in denial or repudiation of [its] rights thereto." *Shea*, 123 A.2d at 361. Based on these facts, the court may "draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 556 U.S. at 678 (citing *Twombly*, 550 U.S. at 556). The motion to dismiss is accordingly denied with respect to Count II.

### 3. Breach of Contract (Count I)

To prevail on a claim of breach of contract, a plaintiff must establish "(1) a valid contract between the parties; (2) an obligation or duty arising out of the contract; (3) a breach of that duty; and (4) damages caused by breach." *Tsintolas Realty Co. v. Mendez*, 984 A.2d 181, 187 (D.C. 2009) (citation omitted). "[T]o state a claim for breach of contract so as to survive a Rule 12(b)(6) motion to dismiss, it is enough for the plaintiff to describe the terms of the alleged contract and the nature of the defendant's breach." *Francis v. Rehman*, No. 14-CV-190, 2015 WL 791408, at *4 (D.C. Feb. 26, 2015) (citing *Nattah v. Bush*, 605 F.3d 1052, 1058 (D.C. Cir. 2010)).

Status' complaint is hardly a model of clarity. Status has alleged at least two different contracts with AFGE—a "time and materials contract," Am. Compl. ¶ 14,[5] and a "commercial agreement for independent contractor services."[6] *Id.* ¶¶ 40. Based on the complaint, it is unclear whether Status is alleging a violation of the "time and materials contract," the contract for "independent contractor services," or both. *See id.* ¶¶ 47-48 (identifying both contracts). It is

---

[5] This "time and materials contract" may refer to and include the following: (1) a contract to "perform work to repair and/or test elevators in the subject property," Am. Compl. ¶¶ 13-14; (2) a contract to "perform various other tasks on a time and materials basis," which "included but was not limited to running cables, repairs to back-up elevator generators and the removal of chiller units as well as renovations to utility rooms," *id.* ¶ 15; (3) "work to install piping in elevator shafts for proper grounding of new equipment and data runs," *id.* ¶ 25; and/or (4) "remov[ing] chiller units from the subject property," *id.* ¶ 32.

[6] In support of its Second Motion to Dismiss, Defendant attaches the "commercial agreement for independent contractor services" and argues that it was a monthly contract that permitted no-cause termination by either side with fourteen days' written notice to the other party. Def.'s Mem at 2-3; Ex. to Mem. in Supp. of Def.'s Mot. to Dismiss, ECF No. 9-2. According to Defendant, the contract was properly terminated on January 16, 2013 based on "the failure of Plaintiff . . . to provide the intended contracted for services until late March 2013, as conceded by Plaintiff[.]" Def.'s Mem. at 3. Plaintiff alleges, however, that the contract was breached not by Defendant's termination, but by Defendant's failure to pay Plaintiff. *See* Pl.'s Opp. at 2.

further unclear whether Status is alleging breach based on AFGE's improper termination of the contract, *id.* ¶ 42, failure to remit payment for services, ¶¶ 51-52, or both.  In its opposition, Status attempts to clarify that "Plaintiff does not allege that Defendant breached the contract by terminating it.  Rather, the breach occurred as the result of Defendant's failure to pay [Status] for work performed and materials purchased prior to the termination[.]"  Pl.'s Opp. at 2.

The "purpose of the minimum standard of Rule 8 is to give fair notice to the defendants of the claim being asserted, sufficient to prepare a responsive answer, to prepare an adequate defense and to determine whether the doctrine of *res judicata* applies."  *Ihebereme v. Capital One*, 730 F. Supp. 2d 40, 47 (D.D.C. 2010) (citation omitted).  Courts have dismissed breach of contract claims for vagueness or imprecision.  *See, e.g., Logan v. LaSalle Bank Nat'l Ass'n*, 80 A.3d 1014, 1023-24 (D.C. 2013) (dismissing claim where complaint failed to specify which contract provisions were breached or what act or omission by defendants constituted a breach); *Edmond v. Am. Educ. Serv.*, No. 10-0578 (JDB), 2010 WL 4269129, at *2 (D.D.C. Oct. 28, 2010) (dismissing claim where complaint failed to allege the existence of a contract between the parties); *Ihebereme*, 730 F. Supp. 2d at 47-48 (dismissing claim where complaint failed to show that the defendant had a contractual duty relevant to the alleged breach).  But, unlike those cases, Status' complaint sufficiently alleges the existence of a contract, its general terms, and the contractual obligation that Defendant purportedly violated (*i.e.* failing to pay Plaintiff).  When those elements are pled, as here, courts have held that plaintiffs have adequately stated a claim, despite the otherwise imprecise or vague nature of the complaint.  *See, e.g., Nattah*, 605 F.3d at 1057-58 (D.C. Cir. 2010) (plaintiff sufficiently pled breach of contract claim where he described the terms of the alleged contract and defendants' breach, despite a lack of clarity in the complaint about when the contract had been formed and who had entered it); *cf. Ponder v. Chase Home Fin.*, 865 F. Supp.

2d 13, 19 (D.D.C. 2012) (*pro se* plaintiff pled a claim despite the complaint being "less detailed

than the complaint in *Nattah*" as he identified the parties and material terms of the contracts and

alleged facts pertaining to his performance and defendant's breach); *Akers v. Beal Bank*, 668 F.

Supp. 2d 197, 200 (D.D.C. 2009) (*pro se* plaintiff sufficiently pled a claim despite failure to attach

or identify the contract at issue or cite the contractual provision that was allegedly breached; her

allegations described the basic contractual terms and the defendant's breach and were thus

sufficient to put the defendants on notice of her claim).  Defendant's motion to dismiss with respect

to the breach of contract claim is therefore denied.

### 4.   Tortious Interference With Contracts and Business Relations (Count VI)

To establish a claim of tortious interference with contractual relations, a plaintiff must

demonstrate "(1) the existence of a contract, (2) defendant's knowledge of the contract,

(3) defendant's intentional procurement of the contract's breach, and (4) damages resulting from

the breach." *Cooke v. Griffiths-Garcia Corp.*, 612 A.2d 1251, 1256 (D.C. 1992) (citation omitted).

The elements of tortious interference with business relations, or prospective business advantage,

are similar, requiring a mere prospective advantageous business transaction instead of the

existence of a contract.  *See Casco Marina Dev. v. District of Columbia*, 834 A.2d 77, 84 (D.C.

2003).

Status alleges that AFGE tortuously interfered with its contract or its business relationship

with *Status'* insurance carrier when AFGE filed an insurance claim for the pringle switch explosion

with *AFGE's insurance carrier* and wrongfully blamed Status for the damage.  *See* Am. Compl.

¶¶ 45, 82.  AFGE does not challenge Status' pleading of the elements.  Rather, AFGE moves to

dismiss solely on the ground that its filing of an insurance claim was "privileged conduct," "as it

[was] carried out in order to protect a present, existing economic interest."  Def.'s Mem. at 9 (citing

*Futrell v. Dep't of Labor Fed. Credit Union*, 816 A.2d 793, 808 n. 13 (D.C. 2003) and *Raskauskas v. Temple Realty Co.*, 589 A.2d 17, 27 (D.C. 1991)).

If Status had pled merely that AFGE's filing of an insurance claim interfered with Status' contract or relationship with its insurance carrier, and no more, AFGE's claim filing arguably would be privileged. But Status has pled more. It alleges that:

> Since terminating its contract with Status, AFGE has engaged in a campaign to blame it for negligence committed by others, including asserting an insurance claim for a ground fault in the pringle switch which caused an explosion in an elevator shaft which Status never had any contact with during its work and which AFGE had expressly retained the services of others. AFGE knew that this explosion was caused by another contractor but sought to blame Status due to Burnett's race and AFGE's status as a minority-owned business.

Am. Compl. ¶ 45. The court must, at the motion of dismiss stage, take as true the facts as alleged in the complaint and draw all reasonable inferences in Plaintiff's favor. *See Hettinga*, 677 F.3d at 476. If the facts alleged are true, AFGE's filing of an insurance claim was not privileged because it was not done to "protect a present, existing economic interest," *Futrell*, 816 A.2d at 808 n. 13 (citation omitted) (internal quotation marks omitted), but rather to harm Status "due to Burnett's race and AFGE's status as a minority-owned business," Am. Compl. ¶ 45. The motion to dismiss with respect to Count VI is thus denied.

## V.   CONCLUSION AND ORDER

For the reasons stated above, Counts III and IV are dismissed with respect to Burnett with prejudice. As to all other claims, Defendant's motion to dismiss is denied. The court will issue a separate order setting an Initial Scheduling Conference in this matter.

Dated:  April 22, 2015

Amit P. Mehta
United States District Judge